### AFFIDAVIT IN SUPPORT OF SEARCH WARRANT APPLICATION

1. I, Daniel DeAntonio, Special Agent of the Federal Bureau of Investigation (FBI), being duly sworn, depose and state as follows:

2. I am a Special Agent (SA) with the Federal Bureau of Investigation (FBI) assigned to the FBI Tucson Resident Agency, Tucson, Arizona. I have been a Special Agent since January, 2019. I am currently assigned to investigations involving crimes in Indian Country, which includes crimes involving firearms. I have investigated these types of crimes during my career with the FBI. The statements contained in this Affidavit are based on my experience and background as a Special Agent and on information provided by other FBI Agents and law enforcement agents.

### PURPOSE OF THE AFFIDAVIT

3. I am submitting this affidavit in support of an application for the issuance of a search warrant authorizing Special Agents with the FBI to search the property, hereinafter referred to as the **SUBJECT DEVICE**, an iPhone in a blue case, as further described below and in Attachment A, which is incorporated to this affidavit by reference in order to search for and seize the items outlined in Attachment B, also incorporated to this affidavit by reference, which represent evidence, fruits, and/or instrumentalities of the criminal violations further described below.

4. Based on the investigation, for the reasons set forth below, your affiant believes there is probable cause to believe that there is evidence on the property described in attachment A, related to a criminal investigation involving Attempted Murder, in violation of Title 18 United States Code 1113, Assault with a Dangerous Weapon, in violation of Title 18 United States Code 113(a)(1), and conspiracies related to these violations, and Title 21 United States Code 846 Conspiracy to Possess With Intent to Distribute a Controlled Substance.

5. The facts in this affidavit are based on my personal observations, training and experience, and information obtained from other agents, officers, investigators, and witnesses named herein. Because this affidavit is made for the limited purpose of

establishing probable cause for this search warrant, I have not listed each and every fact known to me concerning this investigation.

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

6. The SUBJECT DEVICE to be searched pursuant to the attached Application are described in Attachment A and include:

7. An iPhone with a blue case (hereinafter referred to as SUBJECT DEVICE), that was determined to be ARTURO's cell phone.

8. The applied-for warrant would authorize the forensic examination of the SUBJECT DEVICE for the purpose of identifying electronically stored data particularly described in Attachment B. Based on your affiant's training, experience, and understanding of this investigation, he believes that the SUBJECT DEVICE is capable of maintaining evidence as set forth in Attachment B, to include photographs, messages, web searches, location data, and other contacts.

## FACTS ESTABLISHING PROBABLE CAUSE

9. On 06/06/2024, FBI Tucson Resident Agency received information from TFO Detective Christian Ralls from the Pascua Yaqui Tribal Police Department. TFO Ralls advised that on 06/06/2024, at approximately 2311hrs, an unknown male shot at I. C. (hereinafter referred to a Victim 1), date of birth 2009, in the area of 5160 Toroko Vampo, which is located on the Pascua Yaqui Indian Reservation. The unknown male was the passenger in a black Mercedes vehicle (hereinafter referred to as SUBJECT VEHICLE). FBI processed the scene and collected twelve (12) 7.62 shell casings. The casings were in the roadway and at the start of the northern residence's property. These casings were entered into NIBIN on 06/07/2024.

10. Victim 1 was interviewed on scene and explained a black Mercedes drove by his residence, 5160 Toroko Vampo, multiple times prior to the shooting. Victim 1 explained that they were sitting outside at the box (power box), and observed the SUBJECT VEHICLE driving by. the SUBJECT VEHICLE kept driving by. The SUBJECT VEHICLE stopped and the person in the car asked him to come over. Victim

1 told everyone else to go inside. When Victim 1 went up to the SUBJECT VEHICLE, the driver, who was a female, told him to go to the other side. When Victim 1 went to the other side the male in the passenger seat pulled out an AK-47 and started shooting. Victim 1 described the SUBJECT VEHICLE as a black Mercedes. Victim 1 knew it to be a Mercedes because of the logo on the front. When the vehicle stopped, it stopped just east of his house's driveway, and was facing east. When Victim 1 went around to the passenger's side he saw the AK-47. It was a male with curly hair holding the AK-47. The male's hair was like an "afro," but he was light skinned. There was another male in the back of the car. He had curly hair too but not as curly as the male in the passenger seat. This male's hair was shorter. The driver was a female. Victim 1 said the passenger who shot at him was probably 17 years old. Victim 1 stated he never saw him before. When Victim 1 saw the AK-47, the male then cocked it. Victim 1 hid behind the back of the SUBJECT VEHICLE and the passenger started to shoot. Victim 1 did not hear any doors but heard the windows go down. Victim 1 ran toward the cemetery (west) and then cut down the alley. Victim 1 thought he heard about 10 shots and Victim 1 could hear the rounds go by him. Victim 1 thought that bullets went down the road (west). Victim 1 described the AK-47 as having a wooden stock and handle. The other parts of the gun were black. The magazine for the AK-47 was curved and looked like a regular banana clip. Victim 1 explained he had never seen the SUBJECT VEHICLE before but explained it looked like a race car. The female driver did not call Victim 1 over by name. The female looked like she was 16 years old and was a little bit younger than the male. The female was short and was wearing shorts with a shirt over her shoulder. The female was medium build and there was nothing else he remembered about her. Victim 1 explained SUBJECT VEHICLE s Mercedes logo in the grille of the car was lit up. Victim 1 did not know anyone who had a Mercedes and explained the SUBJECT VEHICLE was newer. The SUBJECT VEHICLE was loud and sounded like it had a straight pipe (no or modified muffler). Victim 1 clarified that the male that shot was Mexican, skinny, and tall. Victim 1's brother F. C. (hereinafter

referred to as Witness 1), date of birth 2011, was present when the SUBJECT VEHICLE drove by, prior to the shooting.

11. Witness 1 was also interviewed on 06/07/2024. Witness 1 explained that SUBJECT VEHICLE drove past them and then stopped while his brother (Victim 1), friend and himself were at the green box. The people in the SUBJECT VEHICLE said something and Victim 1 told the people in the SUBJECT VEHICLE to get out of here. the SUBJECT VEHICLE came back again and Victim 1 told Witness 1 to go back inside. After Witness 1 went inside he heard about 10 shots. Witness 1 described the SUBJECT VEHICLE as a Mercedes that had a glowing logo on the front of the car. the SUBJECT VEHICLE was newer and was black. The driver of the SUBJECT VEHICLE was a female, and the passenger was a male with curly hair. There was a person in the back seat, and they were wearing a mask that only showed their eyes. The mask was black. Witness 1 described the female as wearing a pink or white dress. The female's hair was black and blonde, and her face was kind of chubby. Witness 1 described her face as being Asian, but she was white. Witness 1 described the male passenger with the curly hair as having dark skin like his. Witness 1 never saw the SUBJECT VEHICLE before. The SUBJECT VEHICLE stopped east of their driveway and was facing east. Witness 1 explained the passenger with curly hair had it cropped and together. Witness 1 explained he would be able to identify the passenger if he saw a photo of him. The passenger was sticking out of the front passenger window and was sitting on the rolled down window, with his head out of the SUBJECT VEHICLE. The passenger was wearing all black and had jacket on. The passenger in the back was wearing a hat. Witness 1 could not see the license plate, but recalled it being black with white numbers. Witness 1 believed that the shooter lived on the south side of Tucson. Witness 1 explained that Victim 1 used to text the shooter and that Victim 1 had beat the shooter up before. Witness 1 did not know his name but thought Victim 1 said "Art" or "Art Packs" when the SUBJECT VEHICLE drove by. Witness 1 explained that Victim 1 was scared of the shooter and that's why he didn't want to say anything. Witness 1

explained that Victim 1 fought Art at Spectrum and did not know if police came. After Witness 1 heard the shots, he ran outside. the SUBJECT VEHICLE was driving away. Witness 1 ran down the street to the west. While running Witness 1 heard two more shots.

12. J. G.-F. (hereinafter referred to as Witness 2), date of birth 2010, was interviewed on 06/07/2024. Witness 2 explained that they were just standing by the box. The SUBJECT VEHICLE kept passing by them, back and forth. Witness 2 explained that the SUBJECT VEHICLE was a Mercedes. The logo on the SUBJECT VEHICLE was lit up and the car was black. When the SUBJECT VEHICLE drove by the first time, it was driving at a normal speed. When it drove by the second time, it was driving slowly. The SUBJECT VEHICLE sounded normal. After hearing the shots, Witness 2 went outside. They all started running down the road. Witness 2 remembered a female was driving and there was a male in the passenger. The female's hair was back, and she was Mexican or white. She appeared to be medium build. Witness 2 could only see her face. The male had curly hair, but he did not know who they were. Witness 2 couldn't really see their faces.

13. A. B. (hereinafter referred to as Witness 3), date of birth 2004, was interviewed on 06/11/2024. Witness 3 explained that a guy was driving around in Pascua Yaqui, in a black Mercedes. This guy drove up on Witness 3's friend Aaron. The people in the Mercedes were driving in and around Pascua Yaqui. The people also shot at people on the reservation. Witness 3 believed they were around 19 to 20 years old. The people in the Mercedes were part of a gang called OTBG. Witness 3 did not know what OTBG stood for, and explained that they were Mexican and black. Witness 3 did not know who shot from the Mercedes, but his friend Aaron did. Aaron sent Witness 3 a photo of the person that pulled up onto him (Aaron) on the reservation. Aaron told Witness 3 that the person in the Mercedes showed him a gun. The gun that was shown to Aaron was the same gun that was in the photo Aaron sent Witness 3. The person from the photo Aaron sent Witness 3 showed a younger, light skinned male, with curly hair.

When they rolled up on Aaron there were other people in the Mercedes. Witness 3 stated OTBG were off the reservation but may be Pascua Yaqui members. Witness 3 did not know if Victim 1 knew who the shooter was. Witness 3 doesn't know Victim 1 and Witness 1 that well and just started hanging out with them. Witness 3 agreed to send the photos that Aaron had sent him. A description of the photos are below.

- Photo 1 depicts a male holding what appears to be a rifle. The male had a cropped type of haircut and he is standing in front of a red brick house with bars over a window. The male is wearing a black shirt with white writing, blue pants, a white belt, and white colored shoes. The front of a black Mercedes vehicle can also be seen.



/ / /

- Photo 2 depicts a male holding what appears to be a black handgun. The male had a cropped type of haircut and he is standing inside a room with a refrigerator and some type of door. A black rifle, which appears to be a AK-47 style rifle, can be seen leaning against the wall. The male is wearing a black shirt with white writing, blue pants, a white belt, and white colored shoes.



/ / /

/ / /

- Photo 3 depicts a male holding what appears to be an AK-47 style rifle, with a banana type magazine. The male had a cropped type of haircut and he is standing in front of a red brick house with bars over a window. The male is wearing a black shirt with white writing, blue pants, a white belt, and white colored shoes. The front of a black Mercedes vehicle can also be seen.



14. The photos appeared to be from an Instagram account with the username of "hopoutart". The Instagram account was located and viewable. A post from the user showed a black Mercedes bearing temporary tag 274927U. A query of AZ MVD for this temporary tag found it was associated with Arturo Garcia DOB: 05/11/1969 and was the SUBJECT VEHICLE, a black 2018 Mercedes Benz CLA. An open-source query of Arturo Garcia found a relative named **Arturo Garcia Hernandez** (hereinafter referred to as ARTURO) DOB: 12/06/2005. A query of AZ MVD revealed an AZ driver's license with a picture that visually matched the user of the Instagram account.
Name: **Arturo Garcia Hernandez**
DOB: 12/06/2005

SSN: 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

AZ DL: D07735838

Address: 1913 W Mistletoe Circle, Tucson, AZ 85713 (hereinafter referred to as SUBJECT RESIDENCE)

The SUBJECT RESIDENCE is also the residence listed on Arturo Garcia (DOB 05/11/1969), who is the listed owner of the SUBJECT VEHICLE.

A related Instagram account with username "**art.packk**" was also identified and a screenshot of that account is below.





15. A preservation request was submitted for both accounts on 06/12/2024, under Meta Case # 8736496.

16. A search for ARTURO was conducted and it showed he had an involvement with Tucson Police Department (TPD) on 06/09/2024, for a Domestic Violence incident. ARTURO was not at the scene when TPD arrived. According to reports, ARTURO

physically assaulted his girlfriend K. M., date of birth 2005, at 5525 S Mission Road, Apt 3201. Also present during this TPD incident was her roommate I. G. I. G. was the person who called 911. ARTURO had a stop and arrest flag placed on him.

17. On 06/12/2024, I. G. was interviewed by FBI Agents. I. G. explained that ARTURO was her roommate K. M.'s boyfriend. ARTURO had stayed at the apartment and had just recently had a domestic incident with K. M. I. G. explained that ARTURO had pointed a gun at their apartment in the past. I. G. described the gun as being a black colored AK-47. I. G. provided phone number 520-565-7715 as ARTURO's phone number. ARTURO and K. M. drove around all day and sold weed. That was how ARTURO made his money. I. G. explained that last week, ARTURO and K. M. went to do a sale on the Pascua Yaqui Indian Reservation. While doing the sale, ARTURO shot his AK-47 at someone, and K. M. was driving the Mercedes. I. G. confirmed that ARTURO drove and owned a black Mercedes. ARTURO took the AK-47 and all the money when he left I. G.'s apartment on 06/09/2024, before the police arrived. I. G. believed that ARTURO has the AK-47 with him. I. G. was sure the AK-47 was not in her apartment. I. G. knew ARTURO to also have a handgun. I. G. confirmed that ARTURO had an I-Phone 15 and he used it to facilitate his drug deals. It was also how ARTURO communicated.

18. On 06/12/2024, TPD Officers located the SUBJECT VEHICLE, within the city limits of Tucson. TPD Officers observed a male in the passenger seat that matched ARTURO's description. TPD was able to confirm ARTURO was in fact in the passenger seat. TPD had an active arrest warrant for ARTURO, related to the 06/09/2024 Domestic Violence incident. TPD Officers followed the SUBJECT VEHICLE to 1205 E Greenlee Road, Tucson, AZ. TPD Officers observed ARTURO exit the vehicle and enter into Unit #7 (hereinafter referred to as the RESIDENCE). TPD SWAT Team arrived and called ARTURO out of the RESIDENCE. After some time ARTURO exited the RESIDENCE and was arrest by TPD. ARTURO did not have any weapons or cell phones on his person.

19. On 06/12/2024, a federal search warrant was executed at the RESIDENCE. Multiple guns and ammunition were located and seized from inside the RESIDENCE. The SUBJECT VEHICLE was also located and seized from the location. No AK-47 style rifle was found during a brief search of the inside of the SUBJECT VEHICLE. No AK-47 rifle was located within the RESIDENCE. Brief interviews were conducted with the occupants of the RESIDENCE. During the interview of Y.F., Y.F. explained that ARTURO did not come into the apartment with an AK-47 style rifle. Y.F. never saw ARTURO with an AK-47 in person and only saw it on Instagram. An iPhone with a blue case (SUBJECT DEVICE) was located within the RESIDENCE. TPD Detectives called the number associated to ARTURO, 520-565-7715, and the SUBJECT DEVICE rang.

20. TPD advised FBI that TPD surveillance units were following ARTURO for a majority of the day on 06/12/2024. TPD advised that ARTURO was first observed leaving the SUBJECT RESIDENCE. TPD observed the SUBJECT VEHICLE stop at a few different locations but did not observe ARTURO with an AK-47 during that time. One of the locations ARTURO stopped at for a period of time was 5950 South Park Ave APT #511, Tucson, AZ (hereinafter referred to as SUBJECT RESIDENCE 2).

21. On 06/13/2024, FBI and TPD arrived at SUBJECT RESIDENCE 2 and made contact with P.H. and L.M. in the apartment. P.H. explained that she was one of the occupants of the apartment and L.M. was her boyfriend. P.H. gave consent for TPD and FBI to search all common areas of the apartment and her room. P.H. could not give consent for her roommate Victoria Pena. Pena was contacted by FBI and was verbally asked if consent could be given for her room. Pena declined and stated she would be home in a few hours. P.H. did not know the last time ARTURO was over but could confirm he was there approximately a week ago.

22. On 06/13/2024, a Federal Search warrant was obtained for SUBJECT RESIDENCE 2. An AK-47 style was collected. The rifle was a S.C. Nova CGR, 7.62mm. Pena explained that the rifle was not hers and was probably ARTURO's due to him being in

her room. Pena explained she talked and knew ARTURO for approximately a month. Pena talked with ARTURO through Instagram.

23. On 06/17/2024, the CGR was taken to TPD NIBIN, where it was test fired. A E-Trace was also completed on the CGR and it showed a purchase date of 05/29/2024, 15 days prior to the shooting on Pascua Yaqui. The E-Trace also showed that ARTURO was the purchaser of the CGR.

24. On 06/18/2024, NIBIN reported that the 7.62mm casings entered on 06/07/2024, hit on the CGR that was NIBIN'd on 06/17/2024.

25. Based on your affiant's knowledge of this case, as described above, and training and experience, it is likely ARTURO and Victim 1 are in some sort of dispute over the sale of controlled substances, and not only will the SUBJECT DEVICE contain evidence of controlled substance sales by ARTURO, but also the motive for the other violations as well.

## TECHNICAL TERMS

26. Based on my training and experience, the following technical terms are used to covey the following meanings:

    1. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and

other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

2. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

3. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

4. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records of the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites

orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

5. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments, or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

6. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

27. Based on your affiant's training, experience, research, and from consulting the manufacturer's advertisements and product technical specifications available online for

these types of cell phones, and based upon your affiant's discussions with experts, your affiant knows that the cell phone which is the subject of this search warrant application most likely has capabilities that allow them to serve as a wireless telephone, digital camera, portable media player, Internet access device, as these are generally standard features. In your affiant's training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device; evidence of where such persons were when they possessed or used the device; evidence of who such persons were with when they possessed or used the device; evidence of persons with whom they communicated when they possessed or used the device; evidence of text, email, other electronic messaging applications and voicemail communications between the person who possessed or used the device and others; and evidence of pictures and videos taken when they possessed or used the device. Navigational coordinates may also be transmitted to and/or from these devices to determine the user's location through a GPS application.

28. Based on your affiant's training, experience, and research, he believes that the SUBJECT DEVICE has some, if not all, of the capabilities described above. Your affiant bases his belief on the fact that he has seized various phones in the past, has observed the difference between cell phones with these capabilities, and those that do not, and has had experience with countless cell phones capable of the functions stated above, as well as discussions with experts on the capabilities of wireless telephones in general, and his personal research into the functions of certain brands and models.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

29. Based on your affiant's knowledge, training, and experience, he knows that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

30. There is probable cause to believe that things that were once stored on the SUBJECT DEVICE and may still be stored there, for at least the following reasons:

1. Based on your affiant's knowledge, training, and experience, he knows that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

2. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

3. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

31. *Forensic evidence.* As further described in **Attachment B**, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that

establishes how the SUBJECT DEVICE was used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on the SUBJECT DEVICE because:

1. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

2. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

3. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

4. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

5. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

32. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant for which your affiant is applying would permit the examination of the SUBJECT DEVICE consistent with the warrant. The examination may require

authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the devices to human inspection to determine whether it is evidence described by the warrant.

33. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, and extracted, the execution of this warrant does not involve the physical intrusion into a premise. Consequently, your affiant submits there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## **CONCLUSION**

34. Based on the aforementioned factual information, I respectfully submit that there is probable cause to believe that the SUBJECT DEVICE will contain evidence described in Attachment B in support of an investigation related to Attempted Murder, in violation of Title 18 United States Code 1113, Assault with a Dangerous Weapon, in violation of Title 18 United States Code 113(a)(1), and conspiracies related to these violations, and Title 21 United States Code 846 Conspiracy to Possess With Intent to Distribute a Controlled Substance.

Respectfully Submitted,

DANIEL DEANTONIO
Digitally signed by DANIEL DEANTONIO
Date: 2024.06.21 11:36:07 -07'00'

Special Agent Daniel DeAntonio
Federal Bureau of Investigation

Subscribed and sworn by telephone
on this 21st day of June, 2024

_____
Honorable Eric J. Markovich United States Magistrate Judge